# LEHIGH ETC. COAL CO. v. JAMES HAYES ET AL.

ERROR TO THE COURT OF COMMON PLEAS OF LUZERNE COUNTY.

Argued April 15, 1889—Decided October 7, 1889.
[To be reported.]

1. An employer is not bound to supply his employees with appliances not in general use, and when he furnishes to them such tools and appliances as with ordinary and reasonable care may be used without danger, he has discharged his duty and is not responsible for accidents resulting.

2. Where, in an action against a coal operator for the death of an employee, the only negligent act charged against the employer was his failure to provide any appliance for warning employees that a draw of coal was to be made, and there was no evidence that such appliances were in general use, the plaintiff was not entitled to recover.

3. When an employee, nearly 14 years of age, working in a coal chute where it was dangerous to work while coal is being drawn out of it,

sent word to the boss that a draw should be made, his knowledge that a draw might be made and his duty to avoid a known danger, rendered it immaterial whether in consequence of his message a warning of the draw was given or not.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILL-IAMS and MITCHELL, JJ.

No. 370 January Term 1889, Sup. Ct.; court below, No. 355 May Term 1887, C. P.

On April 16, 1887, James Hayes and Ann, his wife, brought case against the Lehigh and Wilkes-Barre Coal Company, to recover damages for the death of James F. Hayes, their minor son, which, as they alleged, had occurred through the negligence of the defendant. The plea was not guilty.

At the trial on January 24, 1889, the following facts were shown:

The defendant was the owner and operator of a colliery in the outskirts of the city of Wilkes-Barre, known as the Stanton colliery. In the operation of the breaker of this colliery, the coal, after being broken in the rolls, runs through screens which separate the different sizes, and thus assorted it falls into troughs called " telegraphs," which conduct and distribute it to the proper bins or chutes, according to size. These chutes are situated under and are entirely covered by a plank floor which extends in front of the screens, and the telegraphs, which are open troughs, made of wood and lined with sheet iron, lead from the screens into the chutes, passing under this floor before discharging the coal. These bins, or chutes, or pockets, hold about 55 to 60 tons of coal each. Being entirely covered over at the top by the floor above mentioned, they are so dark that a person going into one of them to do any work would require a lamp. The mode of getting into them is by stepping down from the floor, which covers the chutes, to a platform and thence entering the chute through an opening in the side.

On February 7, 1887, James F. Hayes, the son of the plaintiffs, being then a boy nearly fourteen years of age, was in the employ of the defendant and working at this breaker. He had been employed as a slate-picker, the duties of which employment were to watch the larger sized coal as it passed from the screens into the telegraphs, and pick out any slate it might

Statement of Facts.

contain.   His father testified that he knew nothing of his son's engaging in any other work.   On the date named, however, young Hayes was engaged in tending the telegraphs.   This work consisted in keeping the coal running, as it passed through the telegraphs into the chutes.   If it should get blocked up in the telegraph itself, the business of the boy in charge was to start it along again, and he was also to watch for a stoppage of the coal through the filling up of the chute to the mouth of the telegraph.   Richard Williams, a witness called for the plaintiffs, testified that in the latter event it was the business of the telegraph tender to notify the boss that the chutes were blocked.   He testified also, under objection by defendant's counsel, that when a blocking would occur by the piling up of coal about the mouth of the telegraph running into the chute, it was customary for the boss to ask the boys working on the breaker to go down into this pocket and shovel the coal away, and that day after day, when they would get blocked, the boys would go down and do this work.   On cross-examination he was interrogated as follows : " Q. State whether you were not in the habit of shoveling away the coal from the telegraph before it got blocked up?   (Objected to.)   Q. You would not wait until the coal blocked up the telegraph before you shoveled it away?   A. Yes, sir.   (Objected to.) "   William Hughes, sworn for plaintiffs, testified as follows: " Q. Was it the custom for some of the boys to go down into the buckwheat chute when it was blocked and shovel away the coal, while you were there?   A. Yes, sir.   Q. You went down, did you, every once in awhile when there was a block?   A. Yes, sir ; I used to go down to help them shovel."   Jacob Rineheart, defendant's foreman, testified for defendant thus: " Q. State whether you ever ordered him to go into that pocket?   A. No, sir; I did not.   Q. It has been stated that he was attending the telegraph; whether he had any business in that pocket?   A. No, sir; it was his business to attend to the telegraph.   Q. It was his business to be outside of the pocket entirely, was it?   A. Yes, sir.   Cross-examination : Q. When the coal got blocked up in the buckwheat chute, I suppose it would have to be shoveled away from the telegraph?   A. Well, not very often.   Q. Not often ?   A. No, sir."   Edward Mills, assistant foreman at the breaker, being sworn for defendant, tes-

tified as follows: " Q. State whether or not you ever gave this boy, or any other boy there, orders to go into this pocket to shovel away coal? A. No, sir; I never did. Q. State whether the boys who attended the telegraph there had any business in this pocket, or whether it was their duty to go in there? A. They did not have no business in there at this time. Cross-examination: Q. When did they have business in there? A. Well, when we would run out of large cars and the chute would block, then the boys would go in and keep the coal back from the telegraph until we would get cars. Q. Then they had business in there when it would block up? A. Just at that time. That would not happen often; would not likely happen month in and month out."

On the date named young Hayes and Richard Williams went down into the buckwheat chute and were shoveling away the coal from about the mouth of the telegraph. There was no testimony presented to show that they had been sent there by the boss. Williams testified that the buckwheat telegraphs were not blocked, but the coal was up to the ends of the telegraphs, and Hayes and himself were shoveling so as to prevent their getting blocked. He admitted having previously stated that there was no need of their shoveling, as there was room enough for the coal to fall, and that this statement was true. William Hughes, who was in the chute for a short time helping Hayes and Williams to shovel, testified that the chute was full up to the mouth of the telegraph. After Hughes had left the chute and gone up to his post at No. 5 telegraph, Hayes and Williams continued to shovel for a while, when Hayes directed Williams to tell the boss that a draw must be made. By a draw is meant the taking of coal out of the chute or pocket through a gate at the bottom. Williams thereupon put his head up out of the chute and called to Hughes, who was on the breaker, to tell the man to draw the buckwheat coal out. Hughes replied that he would tell Mr. Mills, the assistant foreman. Williams stepped down into the pocket again. Mr. Mills not being about just then, Hughes did not deliver to him nor to anybody the message sent by Hayes. A few minutes after this message was received by Hughes, one of the defendant's employees came to one of the draw-gates of the buckwheat chute and opened it, letting about 1½ or 2 tons of the coal run

out of it and into a car to be taken to the boiler house for the supply of the furnace. This caused the whole contents of the chute to sink, and Hayes was caught in and carried down with the mass of coal on which he had been standing, and was smothered. Williams saved himself by catching to a beam which ran through the chute.

The plaintiffs contended that, inasmuch as the evidence showed it to be impossible for a person working in one of these chutes to know by observation that a draw was about to be made, it was the duty of the defendant to provide a system of signals for giving notice, prior to opening the gate, of the intention to draw the coal out of the chute. The mine inspector of the district, the builder of the breaker, and several other experienced witnesses testified for the defendant that this breaker was built in the usual and ordinary manner followed in the construction of breakers in that region, and that they did not know of any colliery where such signaling appliances were in use.

At the conclusion of the testimony, the court, WOODWARD, J., charged the jury as follows:

It seems that on February 7, 1887, James F. Hayes was working at the Stanton shaft, owned and operated by the Lehigh & Wilkes-Barre Coal Company. He was 13 years old, and had worked in and about this breaker for two years. [His ordinary employment there had been that of picking slate, but on the day of his death he was engaged with two other boys in what is known as the buckwheat-coal chute. His business was to shovel coal there to keep the telegraph courses clear of coal, and thus prevent the chute from blocking or choking up.] [9] Richard Williams testifies, that he heard a shout or call from Hayes, to look out, and then saw Hayes going down with the coal in the chute; that he ran to him and tried to hand him a shovel to help him out. He did not succeed. It appears that, at this time, the trap or slide at the bottom of the chute had been opened, and that the coal was being drawn from the chute into a car stationed on a railroad track at its foot. The boy having disappeared, the alarm was given, the drawing off of the coal was stopped, and all the men there went to work to rescue the boy, and after a half an hour his body

was found in the chute, where he had been smothered to death. It is not claimed that any warning, or notice, or signal was given to the boys who were shoveling coal in this chute, that it was about to be drawn. [It would seem from the evidence that Hayes had asked one of his companions to tell Mills, the boss, to have the chute drawn; but it does not appear that this message was communicated to Mills, or that anything was done in pursuance of it.]⁵ Nor is it claimed or alleged in this case, that in this coal region at collieries where the mining of the coal is done substantially as it was done at the Stanton shaft, it has been usual or customary to have any appliance or arrangement for giving notice to the workmen employed as these boys were, of the drawing of the chute. Mr. Williams, a very intelligent man, occupying the responsible position of inspector of mines of this district, states that in 62 openings in his jurisdiction, no such system of signaling or giving notice exists, to his knowledge, in any case. He states, however, that such an instrumentality or arrangement might be used at such collieries; that it would be practicable to employ it, and that several similar accidents to this one having occurred in his district, in one of which a human life was lost, he had advised the employers not to draw their chutes without giving some notice to the parties employed in this way, and that they had promised to act in accordance with his suggestion.

The plaintiffs have sued the defendant for damages, and claim that the disaster which caused the death of their son was produced by the negligence of the defendant. Negligence is the want of ordinary care; or it is the want of care according to the circumstances of the case. Thus defined, negligence may consist in omissions or commissions. It may be shown by establishing the fact that the party in question has omitted the performance of some duty, which as a reasonably careful man, he ought to have performed; or that he has committed some act, which as a reasonably careful man he ought not to have committed. Now, it will be clear to you, gentlemen, from this definition, that there is no absolute rule of the law which it is possible to apply to cases as they arise, and which is unbending. In other words, in plain English, every case must stand on its own footing, and these general rules of the law must be applied by juries to cases as they arise. New rela-

Charge of Court below.

tions in life, new occupations of men, constantly give rise to new cases and new questions; the most that the court can do is to adhere strictly to the general principles of the law, and ask the jury to apply them intelligently to the evidence. The allegation of the plaintiffs is, that they have established the negligence of the defendant by showing its omission to provide a safeguard for its workmen, at a point or place, perilous to human life and limb; that it therefore, has failed to perform a duty which as a reasonable person it ought to have performed; hence its negligence.

Now, we say to you gentlemen, as matter of law, that while an employer is not an insurer of his workman's life or limbs, he is bound to furnish him with ordinarily good appliances and machinery for conducting his work; and he is bound, as employer, to adopt such methods of doing business as shall be reasonably and ordinarily secure and safe. The employer is not required to have the newest and absolutely the best machinery or appliances; for the progress of human invention and improvement is so rapid that no employer could reasonably be held to so severe and impracticable a rule of duty as that would be. But the improvements which ordinary care and the dictates of common sense seem to require, an employer is bound to adopt. Nor is he relieved from this obligation by the fact that he had, for a long time, enjoyed immunity from accident to life or limb, without such improvements, or that other parties engaged in a similar business had neglected to adopt them. In this connection we say to you that common practice is evidence of value in cases like this. It is important where the question is one of negligence, but it is not a conclusive nor a final and absolute test of that question. To show that others do a certain thing in a certain way without disaster, is certainly persuasive of the fact that we may safely do the same thing in the same way; and yet it may be true that we are all acting without proper and reasonable care, and in the event of accident we may all be responsible on the ground of negligence. This I understand to be the rule on this subject. The duty, then, of a jury, in every case, is to consider with conscience and with care, all the evidence in the case, and to remember that the rule of the law is, that he who alleges negligence must prove it; that it is not to be presumed, no matter how afflicting and harrowing the cir-

cumstances attending the disaster which has resulted in the loss of a human life. There are accidents, so-called disasters, which we are all liable to, as we pursue our several callings in life, for which the law provides no remedy in dollars and cents; and when a man claims compensation for disaster, from his employer, he must establish clearly his right, by showing that it occurred by reason of the negligence or want of ordinary care of that employer.

    *      *      *      *      *      *      *      *

Defendant's counsel ask us to charge you upon the following points:

1. That under all the evidence, plaintiffs are not entitled to recover in this action, and the verdict must be for the defendant.

Answer: We decline to affirm that point.[8]

2. That under the testimony in the case, the machinery and appliances in use by the defendant were such as were in ordinary use, and it cannot be held responsible because it failed to use some other or different kind.

Answer: The first proposition contained in this point we affirm. The conclusion, or last proposition, we decline to affirm.[1]

3. That the defendant was not bound to use the newest, safest or best machinery or appliances, and it is not liable for negligence for not having a device for signaling before coal was drawn from the pockets.

Answer: The first proposition contained in this point we affirm; the last proposition or conclusion we decline to affirm.[2]

4. The defendant, under the evidence, was not bound to give notice by signaling or otherwise, to persons in the coal chutes, before drawing coal, there being nothing to show that such was the usual or ordinary mode of conducting this business.

Answer: That point we decline to affirm, and for further answer refer to our general charge.[3]

5. That there is nothing in the evidence to show that the employment in which the deceased was engaged was unusually hazardous, or in any way more dangerous than such employment always had been, and that in accepting the employment he took the attendant necessary risks, and that therefore the plaintiffs cannot recover in this action.

Answer: We cannot affirm that point, because the testimony of the father is that the employment of his son was as a slate-picker.[6]

6. That under the evidence there is nothing to show that the defendant has been guilty of negligence resulting in the injury complained of, and therefore the plaintiffs cannot recover.

Answer: We decline to affirm that point, and refer to our general charge, in which we have said that it is a question for the jury.[7]

7. That under the evidence, the accident was occasioned by the opening of a gate in the buckwheat pocket by a fellow servant of the deceased, and if that was negligence, without giving warning, it was the negligence of a co-employee, and the plaintiffs cannot recover.

Answer: In declining to affirm that point, we say to you, gentlemen, that we do not believe the doctrine of the law in regard to the negligence of a co-employee has any place in this case, there being no evidence of any order or rule of the company requiring particular action by its employees at this chute, in the opening of the gate, as was done in this case.

8. That upon the plaintiffs' testimony it appears that the deceased sent out orders to have the coal drawn from the pocket just before the drawing took place, and therefore, a want of notice to him that coal was to be drawn, was not negligence on the part of the company that will enable the plaintiffs to recover in this action.

Answer: We say to you gentlemen, that that point assumes a fact which is not established in the case; namely, that the notice which the boy desired to send was ever communicated to the party to whom it was directed. We do not think that the facts in the case as shown by the evidence, justify the point, and we decline to affirm it.[4]

With these observations we leave the case in your hands.

The verdict of the jury was in favor of the plaintiffs for $1,500. Judgment having been entered thereon, the defendant took this writ assigning as error:

1-4. The answers to the defendant's points.[1 to 4]

5, 9. The parts of the charge embraced in [   ][5 9]

6-8. The answers to the defendant's points.[6 to 8]

*Mr. Andrew H. McClintock* and *Mr. Henry W. Palmer*, for the plaintiff in error :

1. The principal question is raised under the first, second and third assignments. The plaintiffs did not attempt to show that the breaker was faulty in any of its parts, or different from those in use elsewhere. When an employer furnishes tools and appliances which, though not the best possible, may by ordinary care be used without danger, he is not responsible for accidents: Pittsb. etc. R. Co. v. Sentmeyer, 92 Pa. 276. The only negligence alleged at the trial was the omission to provide some appliance for signaling, when coal was about to be drawn from the pocket. An employer is not negligent because he does not supply his workmen with some appliance never used and never even thought of until an accident occurs, and the court erred in submitting to the jury whether there should have been such an appliance : Ship Building Works v. Nuttall, 119 Pa. 149; Allison Mfg. Co. v. McCormick, 118 Pa. 519; 3 Wood's Ry. Law, § 378; Disher v. Railway Co., 15 Am. & Eng. R. Cas. 233; Wonder v. Railroad Co., 32 Md. 411 (3 Am. Rep. 143); Stack v. Patterson, 6 Phila. 225; C. R. I. & P. Co. v. Lovergan, 118 Ill. 41; Naylor v. Ryleo, 53 Wis. 661; Hickey v. Taaffe, 105 N. Y. 26; Gilbert v. Guild, 144 Mass. 601; Rock v. Indian O. Mills, 142 Mass. 522; Burke v. Witherbee, 98 N. Y. 562. The court should have charged as matter of law that the defendant was not bound to have any appliance for signaling, affirming our first and sixth points.

2. The defendant's fifth point was based upon the fact that the testimony does not show that the employment in which the deceased was engaged was unusually hazardous, or in any way more dangerous than such employment always had been, and that in accepting the employment he took the necessarily attendant risks. A servant takes upon himself the risks incident to the business, as well as those arising from the carelessness of co-employees: Sykes v. Packer, 99 Pa. 465; Pittsb. etc. R. Co. v. Sentmeyer, 92 Pa. 276; Payne v. Reese, 100 Pa. 301; Crawford v. Stewart, 19 W. N. 48; Reading I. Works v. Devine, 109 Pa. 246; Brossman v. Railroad Co., 113 Pa. 490. The court was not justified by the testimony in saying, in the part of the charge complained of in the ninth assignment, that

the decedent's place of business was in the buckwheat pocket. The testimony is clear that his place for work was above the buckwheat and other chutes, on a wide, safe floor, and that his duty when the telegraphs became blocked was to inform the boss. He did not do this, but without orders left his place of work and went into the pocket, and thus by his negligence contributed directly to the cause of the accident. Therefore, if the defendant's negligence was a question for the jury, the contributory negligence of the deceased was likewise. Moreover he was guilty of contributory negligence in not leaving the chute after sending out word to the boss to have the coal drawn. Although this word did not reach the boss, there is nothing to show that Hayes knew this fact. A boy of thirteen years can be charged with contributory negligence: Honor v. Albrighton, 93 Pa. 475.

*Mr. William S. McLean* (with him *Mr. William R. Gibbons*), for the defendant in error:

1. The marrow of the instructions asked for in the points of defendant referred to in the first, second and third specifications of error, was simply this, that the defendant had done its whole legal duty, if, as matter of fact the other operators in the coal regions had never used signals prior to drawing coal out of the pockets, to obviate the dangers connected therewith. If these points had been affirmed, the court would have run counter to the decisions in our own and other states holding it to be the duty of the employer to furnish his employees with suitable and safe machinery and structures for their use: Wharton on Neg., 2d ed., § 211 ; Patterson v. Railroad Co., 76 Pa. 389. Under the fourth and fifth assignments of error, the defendant contends that the want of notice to the deceased that the coal was to be drawn was not negligence, because, having sent word to the boss to make a draw, he should have left the pocket at once and needed no notice. The testimony conclusively established two facts : That the message was never delivered to the boss, and that almost immediately after it was sent the fatal draw was made. The question raised by these assignments could not be determined by the court alone, because involving the consideration of facts to be passed on by the jury, such as the interval between the sending of the message and the making of the draw, the age and experience of young Hayes, etc.

2. The question of contributory negligence on the part of a plaintiff of tender years, under fourteen, is always for the jury: Oakland Ry. Co. v. Fielding, 48 Pa. 320; Crissey v. Railway Co., 75 Pa. 86; Nagle v. Railroad Co., 88 Pa. 39. In Honor v. Albrighton, 93 Pa. 475, the defendant was in no wise negligent, and it was not ruled that the boy's negligence could have been determined by the court alone, if the defendant had been negligent also. The rule that would be applied to an adult is that he only assumes the risks of such dangers as he may protect himself against by the exercise of ordinary care: Pittsb. etc. R. Co. v. Sentmeyer, 92 Pa. 276. But a boy under fourteen years of age might think himself safe where an adult, in the exercise of ordinary care, would know he ought not to go, and therefore a master who employs young servants must provide suitable accommodations for them: Wharton on Neg., § 216.

3. That there was nothing in the evidence showing the employment to be unusually hazardous, could not affect the right of the plaintiffs to recover. The boy was originally hired as a slate-picker only, and the father swears he did not know his son had to go into the chutes. The defendant's fifth point not only requested the court to charge that the boy took the necessary risks, but also that the plaintiffs could not recover. There was abundant testimony that young Hayes and the other boys were required to go into this buckwheat pocket and shovel away the coal from the telegraphs to keep them from choking. The boys Hayes and Williams testify that this was part of their duty, and the breaker boss, Mills, who had charge of the boys, testified that it was their business, when the chute was choked, to shovel away the coal. No negligence of a fellow servant was set up in this case; it rests upon the fact that the employees who drew coal from the pocket had no instructions and were not required by the defendant to give any warning before making a draw, although, as the evidence amply showed, to do so without a warning was very dangerous.

OPINION, MR. JUSTICE GREEN:

Upon the trial of this cause no evidence was given by the plaintiff to show that the defendant's breaker and the machinery used in crushing and screening coal, was in any manner

defectively built, or that it was not built in the same manner and with the same appliances as are used in all similar structures. The single act of negligence in this regard alleged against the defendant was, that it had no appliance and used no means or method by which warning could be given to persons working in the pocket, that a draw was about to be made. No evidence was given to show that it was customary among coal operators to give any such warning in the conduct of their collieries. It follows that there was no proof that the defendant neglected any of the precautions which were usually observed in carrying on the business of crushing, screening and shipping coal. But the defendant did give testimony of importance upon this subject. G. M. Williams, the mine inspector for the district in which this colliery was situated, testified that there were sixty-two collieries or openings altogether in the district, and that this breaker with its chutes and pockets was constructed in the usual, ordinary way, in which such breakers are constructed in that region. He also said he did not know that there was in use, in any of the collieries of the district, any signaling apparatus to indicate when coal is about to be drawn out of a chute to be lowered into a car. Joseph Tyrell, another witness, whose business was building breakers and who built this one, testified that the breaker was built in the usual way in which breakers are built in that region, and that he knew of no breaker in the region in which, prior to this accident, any apparatus or devise was used to signal before coal was drawn from the chute into cars. There was affirmative testimony, therefore, that this breaker was built in the usual way in which all breakers were built in that district, and that there was no custom or use, known to the witnesses, of having appliances of any kind to signal the drawing of coal from the chutes. Against this there was no opposing testimony whatever.

The rule in regard to the obligation of the employer respecting the character of the tools and appliances furnished by him, has been repeatedly stated in the recent decisions of this court. Thus in Pittsb. etc. R. Co. v. Sentmeyer, 92 Pa. 276, we said that when the employer furnishes his employees "with tools and appliances, which though not the best possible, may by ordinary care be used without danger, he has discharged his

duty and is not responsible for accidents." In Payne v. Reese, 100 Pa. 301, we said: "An employer is not bound to furnish for his workmen the 'safest' machinery, nor to provide the 'best methods' for its operation, in order to save himself from responsibility for accidents resulting from its use. If the machinery be of an ordinary character and such as can with reasonable care be used without danger to the employee, it is all that can be required from the employer; this is the limit of his responsibility and the sum total of his duty." In Allison Mfg. Co. v. McCormick, 118 Pa. 519, we said: "The general rule requires of the master that he provide materials and implements for the use of his servant, such as are ordinarily used by persons in the same business; but he is not required to secure the best known materials, or to subject such as he does provide to a chemical analysis in order to settle by experiment what remote and possible hazard may be incurred by their use." In Ship-Building Works v. Nuttall, 119 Pa. 149, we held that the employer was under no obligation to give warning to his employee of the dangerous character of a circular saw, or to provide it with a spreader to prevent accidents. As to the spreader, we said: "The testimony shows that such an attachment is not in general use, and that there is no general agreement among mill owners or practical sawyers that it is a desirable or a useful attachment. It is not enough that some persons regard it as a valuable safeguard. The test is general use. Tried by this test, the saw of the defendant is such an one as the company had a right to use, because it is such as is commonly used by mill owners; and it was error to leave to the jury any question of negligence based on the failure to provide a spreader."

Applying these principles to the facts of the present case, we fail to discover any evidence of negligence on the part of the defendant, so far as the character of the breaker and its appliances is concerned, and hence we can find nothing upon which to support a verdict for the plaintiffs. It was argued that the defendant should have given a warning to the deceased that the coal was about to be drawn, but in view of the fact that the plaintiffs gave evidence tending to show that the boy sent out word that they should draw the coal, he being at that time in the chute, the necessity for any such warning does not ap-

Statement of Facts.

pear. It was a matter of no consequence, so far as he was concerned, whether his message was communicated to the parties outside or not. He at least was bound to avoid a danger which he must have had knowledge was likely to occur immediately. We think a verdict for the defendant should have been directed upon all the testimony. We sustain the first, second, third, seventh and eighth assignments.

Judgment reversed.