JOHNSON, ADMINISTRATOR, RESPONDENT, *v.* BOSTON AND MONTANA CONSOLIDATED COPPER AND SILVER MINING COMPANY, APPELLANT.

[Submitted May 1, 1895. Decided May 13, 1895.]

NEGLIGENCE—*Master and servant—Ordinary care.*—In defining "ordinary care" the courts recognize that no fixed arbitrary rule can be laid down, but that the degree of care and vigilance required varies according to the exigencies which require attention and vigilance, conforming in amount and degree to the particular circumstances under which they are to be exercised.

SAME—*Defective boiler—Degree of care required of employer.*—The care and attention required on the part of an employer in furnishing a steam boiler is relative to the work to be done by the boiler, and the capacity of such an instrument for harm as well as for good.

SAME—*Same—Liability of Employer.*—In the case at bar the defendant, acting upon the opinion of an experienced engineer as to its capacity, had an old steam boiler, in bad condition, repaired, so that it could be made to answer for temporary purposes in pumping water, where about sixty pounds pressure would suffice, and the boiler was used for such purposes for about six months. It was afterwards placed in the concentrating works of the defendant and connected with the same steam pipe with which larger and stronger boilers were connected, and this was done by the defendant's engineer, who knew of the bad condition of the boiler and that it was not fit to carry more steam than seventy pounds as a maximum pressure. A test of the boiler was made before it was fired, primarily, to see if it leaked and the test was made with only one guage. The plaintiff's intestate was in the employ of the defendant as a boss carpenter, and while in the boiler room in the discharge of his duty, the boiler in question exploded, resulting in his death. *Held,* that the boiler was not such a reasonably safe appliance as the defendant ought to have furnished for use in its works where its employes were exposed, and that the plaintiff was entitled to recover.

SAME—*Same—Instruction as to duty of employer.*—In an action for damages for the death of an employe caused by the explosion of a steam boiler, an instruction that the defendant "is required to supply its employes with safe and suitable machinery," is not misleading and erroneous, where this rule is qualified by further instructions in the charge, that the defendant is not liable if a defect in the boiler causing the explosion was "latent,—that is, if it could not be discovered by ordinary care on the part of the defendant," and that in providing machinery for the use of his servants the master does not warrant the safety of such machinery, or is he required to see that such machinery is absolutely safe, and "in this case, if defendant furnished such a boiler as a reasonably prudent man would furnish, the plaintiff cannot recover, and your verdict should be for the defendant." (*Kennon* v. *Gilmer,* 5 Mont. 257, cited.)

*Appeal from Second Judicial District, Silver Bow County.*

ACTION for damages for causing the death of plaintiff's intestate. The case was tried before McHATTON, J. Plaintiff had judgment below. Affirmed.

Statement of the case by the justice delivering the opinion.

This is an action by Charles M. Johnson, as administrator

of the estate of William O'Connor, deceased, against the Boston & Montana Consolidated Copper and Silver Mining Company, a corporation operating mines at Butte, to recover damages for the alleged negligence in using a boiler, which exploded in November, 1888, and killed the plaintiff's intestate. There was a trial before the court and jury, resulting in a verdict and judgment in favor of plaintiff for $2,500. The defendant moved for a new trial, and from the order overruling the same, and from the judgment, this appeal is taken. The complaint alleges that the defendant owned and used, in the concentration of ores, the old Colusa concentrator works at Meaderville, in Silver Bow county; that the deceased, about November 19, 1888, was in the employ of defendant at said concentrator as a boss carpenter; that it became the duty of the defendant to procure good and secure boilers with which to generate the steam usually required and necessary to propel and work the engine and machinery used in the said concentrating works; that the defendant carelessly, negligently, and unskillfully provided and used at said works, at said time and place, an unsafe, defective, and insufficient boiler, of all of which it had notice prior to the time of using the same; that for want of due care and attention to its duty in that behalf, on the said 19th of November, 1888, while the said boiler was in use, the said William O'Connor was called upon, in the line of his duty as boss carpenter, to enter the boiler room to inspect certain carpenter work, and that, while he was in said boiler room so inspecting said carpenter work, one of the boilers therein, connected with the engine aforesaid of said works, and in use for generating steam therefor, by reason of its unsafeness, defectiveness, and insufficiency, exploded, whereby said William O'Connor was fatally injured.

The defendant denied any negligence on its part, as alleged, or that it used in the said concentrating works any unsafe, defective, or insufficient boiler, or machinery of any kind, or that, by reason of any carelessness or negligence on its part, plaintiff's intestate was killed. The defendant further answered, and averred that the boilers used to generate steam to run the con-

centrator were good, safe, and sound, and in every respect proper to be used in the works for which they were used at the time the explosion occurred, and were in safe and serviceable condition, and that the engineers in charge were competent, but that, if the deceased was killed by the negligence of any one, it was by the negligence of the engineer in charge at the time the accident occurred, who was a fellow servant of the deceased, and not an agent or vice principal of the defendant, and that if there was any defect of any kind in the boilers defendant had no notice thereof, and was not aware of the same, and such defect, if any, was latent, and could not have been detected or exposed by the most careful and critical examination by competent and skilled engineers and boiler makers.

The replication of plaintiff simply denied that the engineer was the fellow servant of the deceased.

On the trial the plaintiff, to sustain the issues of his complaint, offered evidence tending to prove the following facts: The boiler which exploded had been used at the Colusa mine about four years before the explosion. The defendant moved the boiler out of the Colusa mine house, and put in another boiler instead. After the removal the boiler laid outside of the building for awhile, it is difficult to tell just how long, but about ten months before the explosion the general manager and chief engineer of the defendant company employed a competent boiler engineer to repair it. The object of the repairs was stated to be to run the pump from the creek. The boiler maker, a mechanic of skill and 33 years' experience, whose name was Sloan, said he thought the boiler could be repaired for the purposes suggested, and asked Heimbach, the machinist and engineer of the defendant, how much steam would be required. Heimbach told him about 60 or 65 pounds would run the pump. Sloan told him that there were a couple of sheets that would have to come out, and the flues would have to come out, and be welded and put back. Heimbach told Sloan that all that the boiler would be required to do was to run the pump from the creek. Couch, the general manager,

spoke to Sloan about the boiler, and, when told what was nec-
essary to be done, said that if the boiler would run for six
months or a year, he would get a new boiler put on the pump.
The repairs were greater than were expected, whereupon
Heimbach told Sloan to do the best he could, and after they
ran it awhile they would get a new boiler.   The iron was old
and crystalized.   Its tensile strength was partly gone, and
there was a scale all the way from one-sixteenth to three-six-
teenths of an inch, which would weaken the iron in its capacity
to resist pressure. Sloan took the scale out of the boiler. The
thickness of the iron was one-fourth of an inch.   But this was
reduced by the scale, which had cut through from one-eighth
to one-sixteenth of an inch.   The diameter of the boiler was
40 or 42 inches.   Its capacity was 40 horse power.   Its length
14 feet.   It was single riveted, and 6 to 8 per cent. weaker
than a double riveted boiler. The boiler, after several months'
use at a pump, was placed between two larger boilers in the
concentrating works.   The other boilers were five-sixteenths
iron, and their capacity nearly double that of the one which
subsequently exploded.   An examination of the boiler after
the explosion showed that it was torn to pieces, the old iron
sticking to the new sheets which Sloan put in, the new iron not
being torn.   The boiler was lying between the two larger
boilers.  Patches had been put upon the boiler prior to the time
that Sloan repaired it.   These were not visible after the explo-
sion, by reason of the condition of the boiler.

Sloan testified that the cause of the explosion was that the
iron in the boiler was not good enough to stand the pressure
that the defendant wanted to put on it; that the boiler was not
fit for the place where it was put; that the explosion might
have occurred by turning on the steam; and that the boiler was
not good enough to go alongside of such boilers as the other
two were.   When the boiler had been repaired in the Decem-
ber previous to the explosion, it was tested with water, merely
to see if it was tight, and was perfectly tight.   The general
manager was then told that the boiler was good for 60 or 65
pounds of steam.   It further appeared that if the steam from

the two new boilers was turned into this old boiler suddenly it would cause evaporation, and a strain equal to the pressure in the boilers on either side, and the old boiler would have to give way because the other boilers were so much larger, or, if the steam from the other boilers was turned on quickly, the old boiler would explode. When the repairs were made on the old boiler, punched instead of drilled holes were made. This fact also tended to slightly bend the fibers of the iron between the holes, which would not have occurred had the holes been drilled. Sloan says also that the work was to be done " as quick as possible, and as cheap as possible," and he was to be directed in part by Heimbach. Sloan testified, further, that when he told the agents of the company that the boiler was good for 60 or 65 pounds, he meant that as a maximum pressure which the boiler would stand, and that the agent said that 55 or 60 pounds would do to run the pump, and for that pressure he considered it perfectly safe. When Sloan finished repairing the boiler it was set up in a pump house, and used to run a pump of compound low pressure, requiring between 50 and 60 pounds of steam. It did not leak while used for pumping purposes, and while it was so used it showed no signs of weakness.

The principal witness for the defendant was A. Heimbach, an employe of defendant, and an expert machinist of 35 years' experience, and, according to his evidence, the boiler was thoroughly repaired by Sloan, and pronounced by Sloan to be "all right." It was tested before it was used for pumping purposes, and after it had served its purpose in that capacity, and before it was put into the concentrating works, it was again tested, and showed no defects, "more than any boiler would have that was used the same number of years." When Sloan commenced to repair it, it was not in a condition to be used for any purpose whatever, and Sloan was directed to cut out what was poor. The last test made, within 30 days before the boiler was put into the concentrating works, was made with cold water, 120 pounds pressure to the square inch, and with a hammer. It was perfectly tight, and the witness thought it

capable of doing the work in the concentrator. The test was not made as to its capacity. He further said that there were boilers in the works as old as the one in question, and that this boiler did the same work that they were doing, as far as its capacity went. "I knew," said the witness, "by the steam connection on the other boilers that it had to be necessarily connected with the same steam pipe, and had been used in the same way as this boiler." The witness denied that he ever told Sloan that if this boiler lasted six months he would get a new boiler. After the hammer and water test had been made by the defendant's agents, the boiler was never used until the day it exploded. Before the boiler was set up in the concentrating works it was scraped out with a scraper, and washed, in the manner usual in cleaning boilers. One gauge only was used in the test.

One witness, an experienced engineer, said that his rule for determining how much a boiler would stand to the square inch was to multiply the thickness of the iron by 56, if it was single riveted, and by 70, if it was double riveted, and multiply that by one-half the internal radius, and divide that by 10,000, which would give a safe load, and that this boiler in question would blow off at 70 pounds, which amount of steam he thought the boiler would carry, and that he considered that he had used worse boilers than that one in Butte. The same witness, Wing, an employe of the company, said that the boiler was carrying 55 pounds of steam about 10 seconds before the explosion, and that there was then no attachment to any other boiler. Pickering, another employe, testified that he had just read the gauge three or four seconds before the explosion. He had been taking up the time through the works, and had seen the engineer standing on a ladder by the boiler. The engineer spoke to the witness, and said, "We will soon have her connected," which statement prompted witness to notice the gauge. The rebuttal testimony of plaintiff was to the effect that the way to ascertain the pressure upon a boiler is to take one-fifth of the tensile strength of the iron, and divide by the diameter of the boiler on 10,000, or one-fifth of whatever the pressure

may be, and the bursting pressure is ascertained. Two gauges are usually used in testing; because one may be wrong, while two should work directly together.

*Robinson & Stapleton,* for Appellant.

It is an infallible rule of law that where two instructions on a material point in the case conflict, the verdict cannot stand, for that it cannot be known by which the jury was guided. On this point, and as to what courts have regarded as conflicting instructions, see: *Estate of Cunningham,* 52 Cal. 465; *Flick* v. *G. H. & L. M. M. Co.,* 8 Mont. 305; *Brown* v. *Mc-Alister,* 39 Cal. 575; *People* v. *Wong Ah Ngow,* 54 Cal. 154; *Arguello* v. *Bowes,* 67 Id. 449; *Harrison* v. *Spring Valley Hydraulic Gold Co.,* 65 Id. 375; *People* v. *Simmons,* 60 Id. 73; *Chidester* v. *Con. P. Ditch Co.,* 53 Id. 57; *Kelley* v. *Cable Co.,* 7 Mont. 73.

*Thompson Campbell* and *D. E. Waldron,* for Respondent.

There are no conflicting instructions as urged by appellants. The charge of the court as a whole is entitled to a reasonable interpretation, (*Castle* v. *Bullard,* 23 How. (U. S.) 172-189,) for the courts have said the jury are presumed to have understood the charge according to the fair import of its terms, when taken together; and it thus becomes a question of construction, to ascertain what the charge really did mean. It is to be considered and construed, as a whole, in the same connected way in which it was given, upon the presumption that the jury did not overlook any portion, but gave due weight to it as a whole; and this is so, although it consists of clauses originating with different counsel and applicable to different failures of the evidence. (*Carrington* v. *Pac. Mail S. S. Co.,* 1 Cal. 475; *Clark* v. *McEllery,* 11 Id. 154; *Smith* v. *Carr,* 16 Conn. 450.) And if when so construed it appears probable, that the jury were not mislead by it, the judgment will not be reversed, although its parts may be in some respects slightly repugnant to each other. *Carrington* v. *Pac. Mail Supra;*

*Moore* v. *Sanborin*, 42 Mo. 490; *Karl* v. *Kan. City R. Co.*, 55 Id. 476-482; *Edwards* v. *Cary*, 60 Id. 572; *Henchen* v. *O'Rannok*, 56 Mo. 289.) Or because some of them taken abstractly may have been erroneous. (*Adams* v. *Nantucket*, 11 Allen 203; *Jackman* v. *Bowker*, 4 Met. 235; *Mead* v. *Boxborough*, 11 Cush. 262.) And construing in this way the rule is, as we have already seen, that if the charge states the law of the case correctly and presents the case fairly to the jury, so that they are not mislead by it to any erroneous conclusion, any particular error or inaccuracy in it, which, if standing alone would be subject to such criticism will be cured. (*Philips* v. *Ocmulgee Mills*, 55 Ga. 633.) If, therefore, instructions are found, which state the law incorrectly and yet they are qualified by others in such a manner that the jury were probably not mislead, it will not be ground for reversing the judgment. (*Springdale Cemetery Assn.* v. *Smith*, 24 Ill. 480; *Toledo & C. R. Co.* v. *Ingraham*, 77 Id. 309.) If a new trial would lead to the same result, the rule is, that the court will not interfere to grant a new trial, where it can perceive from the record, that notwithstanding the instructions complained of, or in the event of the jury having been rightfully instructed the verdict would have been the same; that the jury were bound to find as they did, or that upon a new trial the verdict would be the same. (*Brown* v. *Bowen*, 30 N. Y. 520; *Boston* v. *Lawson*, 1 B. M. 46; *Graham* v. *Bardley*, 5 Humph. 476; *Sheldon* v. *So. School Dist.*, 24 Conn. 88; *Hewitt* v. *Jones*, 72 Ill. 218; *Foster* v. *Chicago & C. R. Co.*, 84 Ill. 164.)

HUNT, J.—The specifications of errors which we will consider, as they relate to the issues before us by the record, are, substantially: (1) Was the boiler which exploded and killed plaintiff's intestate defective and unsafe for the uses and purposes to which it was put by defendant? (2) If it was unsafe or defective, was such condition patent or latent, and did defendant know of such defect or unsafety, or ought it, in the exercise of ordinary care and prudence, to have known of such

defect or unsafe condition? (3) Did defendant use that degree of care required in furnishing and using the boiler for its concentrating works, or was defendant guilty of such negligence in these matters as to render it liable in this action for the death of one of its employes, plaintiff's intestate?

The first question may be easily answered by referring to the proof that the boiler exploded upon the first day that it was put into service in the works. Accepting as true the statements of the defendant's witnesses, that the boiler was carrying only 55 pounds of steam less than 10 seconds before the explosion, and was at that time unconnected with the larger boilers upon either side of it, and was simply being "warmed up," as it is expressed, it is an almost irresistible inference that the terrific explosion which ensued within 10 seconds thereafter, by which the boiler was torn to pieces, was due to a radically unfit condition of the boiler to either carry the steam pressure which was then marked, or the probable increased pressure which was added by increased heat or connections with other boilers within the ensuing seconds. It naturally follows, therefore, that the boiler was unfit for the uses to which it was put (whether or not such uses were or were not reasonable or unreasonable) when the explosion occurred. We will therefore, in the light of the fact of the explosion, pass to the second and third inquiries concerning the defects in the boiler, and the alleged negligence of the defendant.

The boiler was old and in bad condition before repair. Such doubts did defendant have about 11 months before it exploded, of its capabilities, that it seemed to hesitate to make use of it at all, until, in the opinion of Sloan, it could be made to answer for temporary purposes in pumping water, where about 60 pounds pressure would suffice. And it was upon the theory that it was only to be so used, and for about six months that Heimbach, for defendant, directed the repairs to be made. We must attach stress to the brief period of time for which it was said use was to be made of the boiler, because Mr. Couch, the general superintendent, who advised Sloan that a new boiler would be procured in six months or a year, does not specifi-

cally deny that he made such a statement, or that such was the contemplated plan of his company. It is important, too, in adding weight to the whole testimony of Sloan, who says that the boiler was repaired, with the end in view of its use for pumping purposes, independently of any connection with other boilers of greater size, greater strength, and much more recent construction. Heimbach knew of the several patches which Sloan was putting upon the boiler to fit it for temporary service. He knew, as a mechanic and engineer of experience, that an old repaired boiler, once removed from mining works, and for a long time exposed to the impairing causes of scale and crystalization, was weakened generally, and that the iron was less capable to resist pressure than it would have been had it not been covered with a scale of one-sixteenth to three-sixteenths of an inch. He knew the boiler was single riveted, and that the holes made in the iron where the patches were put on were punched and not riveted. He knew, also, that the boiler was not fit to carry more steam than 70 pounds, as a maximum pressure. Yet, with all this knowledge, which was the knowledge of the company in this suit, long after the six months use for pumping purposes had expired, and after additional age and wear and tear had wrought their deleterious effects upon the boiler, the defendant determined to use the boiler in the works, where Heimbach admits it had to be necessarily connected with the same steam pipe that the adjacent and larger and stronger boilers are connected with. It is true that a test of the boiler was made before it was fired. But this test was evidently made, primarily, to see if the boiler leaked. It was made, too, with only one gauge, whereas, it appears, two are more certain, and are commonly used to insure that high degree of accuracy which should govern all boiler tests (particularly old and weakened boilers), but which can only be had where even the possible imperfection of a single steam gauge is guarded against.

So that, notwithstanding the test, we are constrained to conclude, from all the evidence, that the boiler was not such a reasonably safe appliance as defendant ought to have furnished

for use in its works where its employes were exposed. The defects were numerous, and not latent. The case is accordingly quite free from the difficulties often attending the imputation of a lack of that ordinary vigilance and care which ought, in reasonable prudence, to be exercised where dangerous machinery is used. The boiler was altogether so old and defective and weak that it could not perform the service required, and, by reason of the many defects hereinbefore recited, ordinary prudence should have deterred the defendant's servant, Heimbach, from using it at all in the works, or from placing it where a connection with other and larger boilers was to be made.

Now, when we test the conduct of defendant by the standard of duty imposed by law upon all employers towards employes, where steam boilers are used, in respect to the safe condition of such boilers, we are of the opinion that the defendant was negligent.

*Jones* v. *Yeager*, 2 Dill. 64, Fed. Cas. No. 7,510, was a case of negligence in a boiler explosion where there was some evidence that the boilers were old in their iron, in some places less than the ordinary thickness, and brittle, and the contention was that the explosion was caused by such defect. The defense, among other matters, was that the boilers had been regularly inspected, according to ordinance, and had been overhauled and put in repair but a few months preceding the explosion. Judge Dillon answers the question of the duty of employers towards employes in such cases in the following language: "This is an important question, and must be carefully answered. The employer does not, impliedly, engage to insure his servants that there shall be no accidents resulting from the use of such machinery. Steam, which is a necessary, is at the same time a dangerous, power, and the danger which attends the use of it imposes upon the owner of machinery propelled by it certain duties and obligations, and these are to use ordinary care and prudence (the degree of this must be proportioned to the danger) to have and to keep the boilers and machinery in a safe and sound condition. If the employer

knows that his boilers are defective, or if, under all circum-
stances, as a reasonable man, he should have discovered,
though he did not, their defective condition, or if he negli-
gently remained ignorant of their defective condition, if the
defective condition thereof was the direct and proximate cause
of an explosion which injured the servants, who are blame-
less, and who did not contribute towards the production of the
accident by their own fault or neglect, then the law is that the
employer is liable to such servants in a civil action for damages
thus occasioned." The learned judge says the duties are "to
use ordinary care and prudence to have and to keep the boilers
and machinery in a safe and sound condition."

The courts have very frequently, within the last few years,
been called upon to define the meaning of "ordinary care and
prudence." New inventions in steam and electrical machinery
have resulted in new occupations for men, and new mechanical
appliances whereby their labor is employed. Thus are unfor-
seen and nice questions of the law of negligence constantly
arising as these new relations of employes and employers are
discussed and considered by the courts. Familiar underlying
principles, evolved from generations of experience and thought,
are to be applied to the peculiar phases presented by the facts
and circumstances of the particular case under investigation.
And so we find the opinions, in discussing the definition of
"ordinary care," recognize that no fixed arbitrary rule can be
laid down, but that the degree of care and vigilance required
varies according to the exigencies which require attention and
vigilance, conforming in amount and degree to the particular
circumstances under which they are to be exercised. The care
and attention necessary on an employer's part in furnishing a
steam boiler is relative to the work to be done by the boiler,
and the capacity of such an instrument for harm as well as
good.

In a concentrating works, where three large boilers are
needed, aggregating about 200 horse power, it requires no
technical knowledge to say that many men are necessarily
employed about such machinery, and that the dangers and

responsibilities of the owners and of the men employed are great; hence ordinary care in furnishing suitable boilers for such works would be a much higher degree of care than, for instance, would be ordinary care in furnishing a wagon wherewith to haul the concentrates from the works to a railroad depot or elsewhere.

The circuit court of the United States for the eastern district of Michigan charged a jury in relation to negligence and ordinary care as follows: "You fix the standard for reasonable, prudent and cautious men under the circumstances of the case as you find them, according to your judgment and experience of what that class of men do under these circumstances, and then test the conduct involved, and try it by that standard; and neither the judge who tries the case, nor any other person, can supply you with the criterion of judgment by any opinion he may have on that subject." (*Railway Co.* v. *Ives*, 144 U. S. 408, 12 Sup. Ct. 679.) The supreme court of the United States review the instructions in the following approved language: "But it seems to us that the instruction was correct, as an abstract principle of law, and it was also applicable to the facts brought out at the trial of the case. There is no fixed standard in the law by which a court is enabled to arbitrarily say in every case what conduct shall be considered reasonable and prudent, and what shall constitute ordinary care, under any and all circumstances. The terms 'ordinary care,' 'reasonable prudence,' and such like terms, as applied to the conduct and affairs of men, have a relative significance, and cannot be arbitrarily defined. What may be deemed ordinary care in one case may, under different surroundings and circumstances, be gross negligence. The policy of the law has relegated the determination of such questions to the jury, under proper instructions from the court. It is their province to note the special circumstances and surroundings of each particular case, and then say whether the conduct of the parties in that case was such as would be expected of reasonable, prudent men, under a similar state of affairs. When a given state of facts is such that reasonable men may fairly differ

upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court." (*Railway Co.* v. *Ives,* 144 U. S. 417, 12 Sup. Ct. 679.)

The appellant argues that the charge of the district court was not based upon the correct doctrine of ordinary care, as it should have been applied to the boiler used, and complains of the following instruction: "'A corporation is required to supply its employes with safe and suitable machinery, and, through its officers and proper servants, make all reasonable efforts and take proper care to keep such machinery in safe and serviceable condition, and to that end make, through its officers and proper servants, all needed inspections and examinations. In this case, if you find from the evidence that the boiler in question was defective and unsafe, and that the officers of the corporation defendant and its proper servants failed to provide a safe and suitable boiler, or failed to make all necessary inspections and examinations to keep such boiler in safe and suitable condition, or, making such inspection and examination, failed to remedy the defects, then you must find a verdict for the plaintiff." The objection goes especially to the law as given requiring the corporation to supply its employes with "safe and suitable machinery." It might be that this statement of the law, without any qualification, would be calculated to mislead a jury into the error of believing that safe machinery means absolutely safe or perfect instrumentalities for the performance of work. Such exact perfection is not the test. The employer is in duty bound to see that the machinery is fit and safe for the work, only so far as due and reasonable care and diligence and prudence will go towards having it, and keeping it, safe and fit. He is not a warrantor of the safety of the machinery, and, when he has exercised the degree of care hereinbefore discussed as ordinary or reasonable, his duty is done. (Wharton on Negligence § 211.)

The general principle which must govern is stated as follows

by Justice Lamar for the supreme court of the United States: "Neither individuals or corporations are bound, as employers, to insure the absolute safety of the machinery or mechanical appliances which they provide for the use of their employes. Nor are they bound to supply the best and safest or newest of those appliances, for the purpose of securing the safety of those who are thus employed. They are, however, bound to use all reasonable care and prudence for the safety of those in their service, by providing them with machinery reasonably safe and suitable for the use of the latter. If the employer or master fails in this duty of precaution and care, he is responsible for any injury which may happen through a defect of machinery which was, or ought to have been, known to him, and was unknown to the employe or servant." (*Railway Co.* v. *McDade*, 135 U. S. 570, 10 Sup. Ct. 1044; Bailey, Mast. Liab. p. 14; Wood, Mast. & Serv. § 329; Shear & R. Neg. § 92; Thomp. Neg. p. 982, § 11, par. 7; *Coal Co.* v. *Hayes*, 128 Pa. St. 294, 18 Atl. 387; *Carlson* v. *Bridge Co.*, 132 N. Y. 273, 30 N. E. 750; *Wilson* v. *Linen Co.*, 50 Conn. 433.) In *Diamond* v. *Northern Pacific R. R. Co.*, 6 Mont. 580, the court discuss the principle as applicable to common carriers.

Conceding, therefore, that, as given, the instruction, standing alone, seemed to import a general rule that perfect or absolutely safe machinery was the standard of duty, still we find the qualifications of the rule carefully laid down in other instructions throughout the charge. The jury were told that "a master is never liable for such defects in machinery as could not be discovered with ordinary care, and if you find that the boiler which exploded and killed the deceased, William O'Connor, was defective, and such explosion was caused by such defect, and that such defect in the said boiler was latent, —that is, if it could not be discovered by ordinary care on the part of the defendant,—then said defendant is not liable in damages, and your verdict should be for the defendant." And again, that, "in an action for damages for causing the death of deceased, the burden of proof is on the plaintiff, and he must show that the defendant did not use reasonable care in

procuring for its operations sound machinery, and, if you find that the defendant did use reasonable care in furnishing said boiler for the use of its servants, then you should find for the defendant." The court further charged: "In providing machinery, appliances, or tools for the use of his servants, the master does not warrant the safety of such machinery or tools; he is not an insurer of the fitness of such machinery, and he is not required to see that such machinery or tools are absolutely safe. Nor is he bound to exercise the highest skill, nor to use extraordinary care." "In providing such tools and machinery, he is bound to use only ordinary prudence and care, that the careful and ordinarily prudent man would use under the circumstances. Nor is the master bound to furnish the safest tools and machinery, and in this case, if defendant furnished such a boiler as a reasonably prudent man would furnish, the plaintiff cannot recover, and your verdict should be for the defendant."

When considered as a whole, our opinion is that the law was well and consistently stated, both as to latent and patent defects, and the jury must have had a clear idea of the principles applicable to the issues raised on the trial. To the evidence they applied these rules, and we think their verdict was just. We regard the instructions defining that reasonable care in providing a suitable boiler was the test, as by no means in conflict with the first instruction requiring safe machinery, but as proper limitations put upon the rule stated, and restricting the applicability of the rule within these limitations, which were laid down as qualifications not in conflict with the rule itself. Similar instructions were sustained in *Kennon* v. *Gilmer*, 5 Mont. 257.

The doctrine of latent defects, as said before, has but little to do with the case. Our view of the matter is that Heimbach knew, or ought, in the exercise of ordinary prudence and care, to have known, that such an obviously defective boiler was unsafe without connections, and fearfully so with connections with other and larger boilers. It was negligence on defendant's part to use such a defective boiler at all in the manner

and place where it was used.    Whether connections with the other boilers were or were not made is hard to tell, and, as we look at the testimony, is not of vital importance.    It is probable, however, that, directly after the engineer said they were about to connect the boilers, they did so, and the great amount of steam in the larger boilers rushed into the old one, and that it at once exploded by incapability of withstanding the pressure. The element of contributory negligence needs no consideration, for neither the pleadings nor the testimony raise that issue in the case.    Nor does the alleged negligence of the engineer as a fellow servant require any discussion, for the defendant offered no testimony to support this plea.

The case is somewhat difficult, on the facts, but our best judgment is that plaintiff is entitled to recover, and that the ruling of the district court must be affirmed.

*Affirmed.*

DE WITT, J., concurs.    The CHIEF JUSTICE, deeming himself disqualified, did not participate in the hearing or decision of this case.

