John F. Dooner *v.* The President, Managers and Company of the Delaware and Hudson Canal Company, Appellant.

| 171 | 581 |
|-----|-----|
| 197 | 260 |

| 171 | 581 |
|-----|-----|
| f219 | ²408 |

| 171 | 581 |
|-----|-----|
| 220 | ²566 |

*Negligence—Railroads—Master and servant—Appliances.*

An employer is not liable for a personal injury to an employee alleged to have been caused by the use of a particular appliance, where it appears that the particular appliance in question was one of several different kinds, all in common use at the time of the accident.

An employer is not an insurer of the safety of his employees. When the employee undertakes hazardous duties he assumes the risk incident to their discharge from open and obvious causes, the dangerous character of which he has had opportunity to ascertain. An employer is not bound to furnish for his workmen the safest machinery, nor provide the best methods for its operation, in order to save himself from responsibility from accidents resulting from its use. The unbending test of negligence in methods, machinery and appliances is the ordinary usage of the business.

In an action by a brakeman against a railroad company to recover damages for personal injuries, plaintiff is not entitled to recover where it appears that the accident occurred while he was uncoupling an ordinary box freight car from the tender of the engine; that there were two iron steps, a brake and a wheel upon the middle of the end of the car towards the tender, but no ladder, steps or hand-holds at or near the corners of the car; that cars of this description were in common use, and that there was no one standard of appliances for the use of brakemen in common use; that plaintiff after pulling out the coupling pin stood on the narrow ledge at the end of the car, with his back against the car; that he let go his hold of the iron step attached to the middle of the end of the car, stepped to the right side of the car, gave the signal to the engineer by moving his hand up and down beyond the side of the car; then, that in endeavoring to return to the iron step, he took one step towards it, and was taking the second, when he lost his balance and fell off the car, the wheel passing over his leg and crushing it.

Argued April 15, 1895.    Appeal, No. 446, Jan. T., 1895, by defendant, from judgment of C. P. Luzerne Co., Feb. T., 1890, No. 302, on verdict for plaintiff.    Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM and MITCHELL, JJ.    Reversed.

Trespass for personal injuries.    Before LYNCH, J.

The facts appear by the opinion of the Supreme Court.

William I. Dampman, a witness for defendant, was asked these questions by defendant's counsel:

Q. Plaintiff has testified that the accident occurred on a Pennsylvania car having iron steps, a stem-winder brake, a platform about four inches wide, that he had hold of the lower step, kneeled, took coupling pin out, let go, walked to the right corner of the car, signaled the engineer, the car .then moving, turned to find a hand-hold and found none. Whether, assuming that to be so, in your judgment, the brakeman was justified in doing that, without first ascertaining whether that hand-hold was there, or some hand-hold other than the step?

Objected to as not the subject of expert testimony calling for the opinion of the witness, and for his determination of a matter which is entirely within the province of the jury.

The objection was sustained for the additional reason that it had not been shown that the witness knew the circumstances under which it was done. Exception noted and bill sealed for defendant. [1]

Q. What, in your opinion, was the manner in which the plaintiff should have made the flying switch and signaled the engineer?

Objected to as not the subject of expert testimony.

Objection sustained, exception noted and bill sealed for defendant. [2]

The court charged in part as follows:

[I therefore call your attention to the code of rules governing the condition of and repairs to freight cars for the interchange of traffic, adopted by the Master Car Builder's Association and revised at Saratoga, New York, June, 1889. " The within rules and rates have been adopted by the Delaware & Hudson Canal Company, Northern Railroad Department, and take effect on September 1, 1889." This was about two months before Dooner was hurt. These rules provide for defects for which foreign cars may be refused by the company which is to transport them, and among others, on page 10, is this: " Steps, ladders or running boards in bad order or insecurely fastened. Steps, ladders or running boards shall be considered in bad order unless the following two conditions are complied with: Running boards sound and securely fastened to the roof of the car; roof, grab-irons, ladders, handles, sills, steps, ladder sides and rounds all sound and securely fastened to the car body by either bolts or lag screws." There are many other reasons given for rejecting,

but they are not material to this issue.  You will observe, gentlemen, that the rules seem to assume that a car is safe for men to work upon, which has upon it steps, ladders, or other guards of that character.  (They do not provide, in case the ladder or other guard is upon the end of the car and is defective —that is loose, rotten or absent—the car inspector shall reject the car.)] [3]

Defendant's points were, among others, as follows:

1. Since the car in question belonged to the Pennsylvania Railroad Company, and was taken by the defendant in pursuance of its duty as a common carrier, to transport the same, the defendant was not held to the same standard relative to the construction of the car, as in the case of its own cars; and if it was constructed without an iron hand-hold other than the iron steps on the front end of the car the defendant would not have been justified in refusing to receive it.  *Answer:* I decline to affirm this unless the jury are satisfied that the car such as described in this point was in common ordinary use at that time. If they were, the point is well drawn.  The defendant is bound to make such inspection as the nature of the transportation requires, and if it pass and haul cars, faulty in construction, or dangerously out of repair, it is answerable to its own employees who are thereby injured. [4]

3. The plaintiff had the same opportunity to notice the presence or absence of the hand-hold on the corner of the car that he had to notice the location of the iron steps and the brake, and his failure to ascertain this was negligence on his part and the defendant is not liable.  *Answer:* I refuse to affirm this. It is worthy of your consideration that at the time the plaintiff uncoupled the car, he had hold of the iron step.  It is for you to determine, and not for the court, as matter of law, whether he had the same opportunity or not. [5]

4. Since it appears by testimony of plaintiff's own witnesses and by other witnesses and exhibits in the case that freight cars transported on defendant's road and other connecting roads are of many different kinds of construction, some having the hand-holds located in one place and some in another, and some only at one corner of each end, the plaintiff had no right to assume that there was a hand-hold at the right corner of the car.  *Answer:* The plaintiff had no right to assume anything;

it was his duty to be vigilant, to be cautious and careful, and especially cautious and careful when placed in a very dangerous and hazardous position ; but, whether he exercised the caution and care required of him under the circumstances, you must determine. Technically the point is correct, I therefore affirm it. [6]

5. The absence of the hand-hold on the right hand corner of the car was not the proximate cause of the accident. *Answer :* I decline to affirm this because it is a question for the jury to decide. [7]

7. Under all the evidence in the case the plaintiff cannot recover and the verdict must be for the defendant. *Answer :* I decline to affirm this. [8]

Plaintiff's points were as follows :

1. It was the duty of the defendant to exercise reasonable care in furnishing freight cars with the ordinary appliances, rods, ladders, or handles by which the plaintiff, in the performance of his duty as a brakeman on the defendant's cars could perform that duty by the exercise of ordinary care on his part without unnecessary danger to himself ; and if the jury find from the evidence that the defendant failed to exercise reasonable care in furnishing the car, which in this case was loaded with apples, with the ordinary appliances, rods, ladders or handles, and that by reason of such failure on the part of the defendant the plaintiff was injured by falling from the front end of the car in question, while in the performance of his duty and in the exercise of ordinary care on his part, he not knowing or having a reasonable opportunity for discovering the absence of rods or handles on the front end of the car, the plaintiff is entitled to recover damages in the action for the injury sustained by him. *Answer :* I affirm the point, gentlemen, with the explanation that if the injury occurred to the plaintiff while he was in the performance of his duty, and in the exercise of ordinary care, he not knowing or having reasonable opportunity for discovering the absence of the rods on the front end of the car. The exercise of ordinary care is to be considered and understood by the jury in relation to the business in which he was engaged. For instance, what might be care while upon the streets of Wilkes-Barre may be great negligence upon the bumper or front end of a freight car. Ordinary care means care according

to the position in which a person is placed, and what his duty is. Negligence as defined by the Supreme Court is the absence of care according to the circumstances. [9]

2. It was the duty of the defendant before receiving the car from the Pennsylvania Railroad yard for transportation over the defendant's line to exact that such car was provided with such necessary hand-rods or grab-irons as would render it reasonably safe for its brakeman to operate in the exercise of ordinary care; and if the system of inspection provided by the defendant company in such cases before receiving cars from the Pennsylvania yard was defective in not exacting the existence of such necessary hand-rods or grab-irons, then the defendant was guilty of negligence in that behalf. And if it did receive the car in question without having thereon hand-rods or grab-irons as aforesaid, and the plaintiff, while in the performance of his duty in making a flying switch, did not know of the absence of the hand-rod or grab-iron, and had not a reasonable opportunity to discover that fact, and while in the exercise of care suffered the injury complained of by reason of there being no hand-rod or grab-iron on the front of the car in question or on the side near the front, then the plaintiff is entitled to recover in this action, if he was not negligent. *Answer :* We affirm the point with this qualification: If cars of that character, without grab-irons or safety handles or ladders, were in common, ordinary, general use at the time, the defendant did its duty, whether the plaintiff knew it or not; but if they were not in ordinary use, as it is stated before, the plaintiff did not know the car was in that condition, and had not a fair opportunity of learning it, the point is well taken. [10]

Verdict and judgment for plaintiff for $8,104.16. Defendant appealed.

*Errors assigned* were, (1, 2) rulings on evidence, quoting the bill of exceptions; (3–10) above instructions, quoting them.

*Andrew H. McClintock* and *George R. Bedford,* for appellant. —Conceding that the hand-hold was used for the purposes of protection, as claimed by plaintiff, and was lacking on the end of this car, we contend that it was nevertheless the plain duty of the defendant to receive and transport the car: Baldwin v.

C. R. I. & P. R. Co., 50 Iowa, 680; Michigan Cent. Ry. v. Smithson, 45 Mich. 212.

It is manifest that the plaintiff had the same opportunity to notice the presence or absence of the hand-hold that he had to notice the location of the iron steps and the brake. Only a glance was needed to inform himself about the hand-hold, and, according to his own account, he had time and opportunity to learn of the presence of the brake and brake chain and of the iron steps and their number and their relative location.

Actual knowledge of the lack of the hand-hold in question, or plaintiff's familiarity with cars constructed without such hand-hold, clearly is not the test of his duty. Otherwise the company would operate any new kind of car at its peril until its employees had sufficient time in the judgment of a jury to become familiar with all changes made. The fact proved by about all the witnesses on both sides as to the almost endless variety of equipment and appliances on freight cars was sufficient notice to him, and made it his duty to be on the alert and to take the time necessary to ascertain the actual facts as to this car.

*John McGahren* and *Lyman H. Bennett*, for appellee.—The opinion of a witness, whose occupation is the braking and switching of cars, is inadmissible on the question of whether it would be prudent for a man to stand in any other way than flatwise in making a coupling of cars; and whether it is considered safe or unsafe among brakemen to stand facing the draft iron while making the coupling: Pa. Co. v. Conlan, 108 Ill. 93; Rogers on Expert Evidence, 14; Gavisk v. Pacific R. R., 49 Mo. 274.

The servant does not undertake to incur the risks arising from defective machinery or other instruments with which he is to work. His contract of employment implies that, in regard to this matter, his employer will make adequate provision that no danger will come to him, and unless he has knowledge to the contrary he has a right to assume that the machinery which he is required to operate is in a safe condition: R. R. Co. v. Herbert, 116 U. S. 655.

OPINION BY MR. JUSTICE GREEN, November 4, 1895:

The plaintiff was a brakeman in the employment of the corporation defendant, and had been engaged in that kind of ser-

vice about five years prior to the occurrence of the accident in question. The last year of that time he was in the service of the defendant. He therefore had all the experience necessary to qualify him for the performance of his duties, and to apprise him of its risks and hazards. He was twenty-eight years of age and in good physical condition as he testified himself. He received his injury while engaged in the act of uncoupling a freight car from the tender of the engine. He had completed the act of uncoupling by withdrawing the pin, had gone to the side of the car for the purpose of signaling to the engineer that all was right by extending his hand beyond the side of the car, and was returning to the steps on the end of the car when he lost his balance, fell from the car and one of his legs was crushed under the wheels. He claims damages of the defendant for his injury. There was no defect alleged in any of the appliances on the end of the freight car from which he fell, and there is nothing upon which to base an allegation of negligence against the company except the character, or kind of the appliances that were fitted upon the end of the freight car for the use of the brakemen in the performance of their duties. Such an allegation is therefore made, and upon that alone the charge of negligence is based.

The car did not belong to the defendant. It belonged to another company and came to the defendant for transportation over the railroad of the defendant in the regular course of its movement. The defendant was legally bound to receive and transport it under article XVII. sec. 1, of our constitution, which provides that railroads, " Shall receive and transport each other's passengers, tonnage and cars, loaded or empty, without delay or discrimination."

When this case was here before, 164 Pa. 17, our brother DEAN, delivering the opinion, said, " While every road must obey the mandate of section 1, article XVII. of the constitution, ' to receive and transport . . . . cars loaded or empty, without delay or discrimination,' of another connecting road, yet by no reasonable construction, can that be held to mean cars of another road not in a condition for transportation, or not provided with the appliances which ordinary care requires, for the reasonable safety of train crews in properly handling them." He also said, " The measure of duty of the receiving

road as to cars turned over to it for transportation by connecting roads is settled by many cases; 'it is bound to make such inspection as the nature of the transportation requires, and if it pass and haul cars faulty in construction, or dangerously out of repair it is answerable to its own employees who are thereby injured.'"

Of course, this measure of duty cannot be higher than the duty owing by railroad companies to their own employees in respect of the appliances which they are required to furnish on their own cars. That duty is fully discharged if the appliances are such as are in ordinary use though they may not be the best or the safest for the purpose. If the evidence in any given case shows that the appliance was such as was in common use, it is the duty of the court to pronounce upon the case on its merits, and not to send to the jury the question whether it was sufficient for the protection of the employee against accidents.

This consideration renders it necessary for us to examine the testimony and ascertain the state of the evidence on this question in the present case.

The plaintiff's complaint is that the freight car in question was not provided with grab-irons or hand-holds on the end of the car sufficient for his protection from falling. The defendant's reply is that it was provided with steps for the use of the brakemen which were so constructed as to answer the purpose of grab-irons or hand-holds, as well as of steps, and that freight cars having such appliances were in common use, and were sufficient for the protection of the brakemen, if used with ordinary care. There is no question that the iron steps on this car were so constructed that they could be used as hand-holds, and that they were sufficient if actually used. The plaintiff admitted on cross-examination, though with considerable reluctance, that in performing the act of uncoupling the car from the tender he did actually use one of the steps on the end of the freight car while he stooped down, reached the coupling pin and withdrew it, so that the uncoupling of the car was completed successfully and he resumed an erect position, using only the appliance provided. He was asked, " Q. You pulled the pin with one hand? A. Yes, sir. Q. What did you take hold of with the other hand? A. I had nothing to take hold of. Q. Did you

take hold of anything? A. When I pulled the pin I was against the car with my hand like that right on the step—on this lower step.' I had hold of the step when I pulled the pin. Q. Why did you say you hadn't anything to take hold of? A. I had no handle; I had the iron step and that had a hole in it. Q. You had that iron step to take hold of? A. I had. Q. And you did take hold of it? A. I took hold of it while I pulled the pin. Q. Did you let go of the iron step when you went over to the side? A. Yes, sir. . . . Q. What did you take hold of when you walked over to the corner? A. I walked right over with my back against the car, my face toward the tender. Q. You could have uncoupled that car and made that fly with perfect safety if you had held on to the iron step and told the engineer to go ahead? A. If I told him. . . . Q. How many steps did you take toward the brake before you fell? A. I gave the second step. Q. Before you fell? A. Yes, sir. Q. And that was the first time that you tried to find this hand-hold? A. Yes, sir."

It is thus seen that, upon the plaintiff's own testimony, after he pulled the pin he stood up on the narrow beam or dead-wood with his back against the car, let go his hold of the step, stepped to the right side of the car, gave the signal to the engineer by moving his hand up and down beyond the side of the car, then endeavored to return to the iron step, took one step towards it and was taking the second when he lost his balance and fell. He had passed successfully from the iron step to the side of the car on the beam and attempted to return in the same way when he fell in taking the second step. Of course he took the chances supposing that what he had just done he could do again. This is verified by his further direct examination: " Q. What uses are made of these handles on the front end of the car? A. To steady yourself while you are there, to get hold of to use for protection so you won't fall off. Q. This car would have been all right then if it had this hand-hold that you talk about on the end of the car? A. Had something there to get hold of I don't think I would fall off. The Court: Yes, if the witness can answer the question direct let him do so, if he cannot let him say so. A. On the front end of the car if there was a handle there I think it would be all right sure. Q. And you have seen plenty of cars like this, except you say,

this car did not have the hand-hold? A. I have seen cars with iron steps but I always seen handles on the front end of the car. I often seen iron steps but I never saw iron steps as close to a brake wheel as those were on the car I was hurt on." Recross-examination. " Q. If when you pulled that pin and took hold of that iron step you had held on to the iron step, where you would have been entirely safe that day and then called to the engineer, ' All right, go ahead,' and if he had not heard you, all that would have happened you, would have been you would have to try it over again? A. That is it, yes, sir; would not have made the fly. Q. If he had not heard you, you would have to make another trial? A. Yes, sir. . . . Q. Have you seen and handled cars like that represented in the picture (Exhibit C.)? A. No. I have seen cars like that but I don't know whether I ever handled one like it or not. Q. You have seen them, have you? A. That is the only car—photograph—I could get to resemble the one I was hurt on. Q. You have seen cars like that? A. With iron steps, yes, sir. Q. With iron steps like that? A. Yes, sir. Q. And with a stem winder brake? A. Yes, sir. Q. And you have handled them? A. I might have handled them, I have seen them. Q. You know they were in use? A. Like that car? Yes, I have seen a car of that kind. Q. In use? A. Yes, sir. Q. This was a Pennsylvania car was it? A. Yes."

Richard Fitzsimmons, one of the plaintiff's witnesses, having said that he had been a brakeman since 1883 on a number of different railroads, was asked by plaintiff's counsel, " Q. I wish you would tell the court and jury what are the ordinary and usual appliances on the ends of freight cars in use on different roads? A. Well they generally get hand-holds on the side, some has got their ladder crawling up to the top on the sides, some of them has got it in the center of the car, that is in the middle ; I have seen lots of them that had hand-holds right in the center where there was no steps for crawling up in the center. I have seen them then the opposite—have them on the sides ; I have seen them without no hand-holds at all, only just the hand railing crawling up to get on top of the car—that is what you call the ladder I suppose. . . . Q. You say that sometimes these hand-holds are on the end near the side of the car? A. I have seen them without any hand-holds there at all—just

that ladder there. . . . . Q. Of what service is a ladder on the end of a car? A. Well it is used as a general thing for going up and down—top to the bottom. Of course you can use it—well I have often used it by stepping on the brake beam and hanging on that ladder and pulling the pin. Q. That is in coupling and uncoupling? A. Yes, sir, in uncoupling. Q. So that it is a protection? A. Yes, sir." Cross-examined. "Q. Have you seen a great many more cars than the photographs these gentlemen have shown you? A. Yes, sir. Q. The Allegheny Valley Railroad and the Western Maryland Railroad have cars also with stem winder brakes and iron steps? A. Yes, sir. Q. And you have seen cars like that that had a hand-hold at only one corner and none on the other? A. Yes, sir. I don't know whether it had been knocked off or not. Q. You have seen such cars in use? A. Yes, sir. Q. And you have seen a great many cars in use that had no hand-holds on the end, but had them on the side near the corner. A. Yes, sir. . . . Q. And you say that even where the ladder is on the end and near the corner as shown in Exhibit B. you have seen such cars without any handles or grab-irons in use, with nothing but the ladder? A. Well, yes, seen them with nothing but the ladder. Q. With nothing but the ladder? A. Yes, sir. Q. You have seen such cars, too, with a ladder located on the opposite side of that end? A. Yes, sir. . . . Q. The iron steps take the place of a ladder? A. Yes, sir. . . . Q. They do not have both on any car at the same end? A. I never seen where they had."

As the foregoing testimony was given by the plaintiff it must be taken as a fact proved in the case that cars were in common use which had a ladder or iron steps without any hand-holds on the end of the car.

Another witness for the plaintiff, Thomas May, who was one of the brakemen on the train when the accident occurred, and who examined the freight car in question, said, "Q. The iron steps that you speak of were like these iron steps on this picture, Ex. C? A. Just the same, yes, sir. Q. They were in the center of the car? A. Yes, sir. . . . Q. You were shown Ex. D and you said the brakeman could not take hold of that horizontal rod there when he uncoupled the car. Looking at Ex. C he could take hold of the step that had a hole in it, as

plaintiff testified it had, and hold on to that while he made the uncoupling? A. Yes, a man could do that. . . . If he had held on to the step he would have been safe, wouldn't he? A. I should think so, yes. . . . Q. Some have them (ladders) on the side and none on the end? A. None on the end, yes. Q. And some cars have a hand-hold on one side of the car and none on the other—a step and hand-hold on one side, and no step and no hand-hold on the other? A. Yes, sir; that is a step and hand-hold here, and step and hand-hold here; none on this car and none on that. . . . Q. Sometimes that hand-hold and step will be on the left hand side of the car and sometimes it will be on the right hand side of the car? A. Yes, sir. Q. There are about as many different kinds of freight cars as there are cars in a train? A. Well you don't very often find it that way—that thick, but you will find a number of different cars in one train though, often. Q. Take a month through you would naturally find a great variety of freight cars, wouldn't you? A. Yes, in a month you would."

John Berry, another of plaintiff's witnesses, after saying he had been a brakeman for five years, and was familiar with the different kinds of freight cars in use, was asked, " Q. So that there are a great variety of freight cars in use ? A. Quite a number, yes, sir, quite different. Q. And they differ in their construction? A. Mostly, yes, sir. Q. Where they have these steps, the steps take the place of a ladder? A. Yes, sir."

Thomas May, being recalled, was asked, " Q. How many different railroads that you know of use cars with the iron steps on one end and a stem winder brake? A. Why, the Central of New Jersey uses them and the Pennsylvania uses them. Q. The Allegheny Valley Railroad uses that style? A. I call all of them Pennsylvania cars. Q. That you include —The Allegheny Valley? A. Yes, sir."

The foregoing testimony was delivered by the plaintiff on this subject and it was not contradicted by any witnesses on either side. It established that there were many varieties of freight cars in common use differing greatly as to their appliances for the use of the brakemen, some of which were only ladders at the end with a single hand-hold on the side, others with ladders on the sides with one or sometimes two hand-holds on the ends generally at the corner, some with ladders

only on the end without hand-holds, and others with iron steps instead of ladders, and that where this was the case the steps supplied the place of ladders. The testimony of the defendant was to the same effect but a little more definite and precise in its character.

Thus Conrad Alles, a brakeman for thirteen years, was asked: " Q. How many different kinds of freight cars can you recall ? A. Well some day you might have two or three. Q. Whether they had them on that train during the time this plaintiff was employed—from day to day ? A. Some days have two or three different kinds, other days may be six or seven. . . . . Q. In a month how many different kinds of cars ? A. I could not say—about all kinds. Q. Tell us some of the differences in the construction of these cars ? A. Well, some cars has a side ladder, on one end have nothing, on the other end have a brake shaft; some cars has a platform on. Q. You say on one end is what ? A. A side ladder and nothing on the end ; the other end they will have a side ladder and a brake shaft. Other cars has a step on each end of the car, another has it on opposite corners. Q. When you say on opposite corners how many steps would that mean ? A. Two, one on this corner and another on this corner. Q. Sometimes the other way ? A. Yes, sir ; sometimes catch them on this corner and the other on this corner. . . . Q. And with reference to the hand-holds ? A. Well, some have hand-holds on the side of the car, another has it right on the corner of the car. Q. How many hand-holds do some of them have,—that kind that you are speaking of now? A. How many? Well, sometimes catch a car has one crossways, another one up and down right on the outside of the car. Q. Some cars have the perpendicular hand-holds on the oblique corners—how many would that make on a car ? A. Two. Q. Have you seen cars constructed that way ? A. Yes, sir. Q. Tell how he (Dooner) could have made that flying switch ? A. I should think by keeping hold of the cast iron step. Q. How could he have made that flying switch without going to the side of the car? A. I suppose if he kept —he could have kept hold of the cast iron steps and given a signal. Q. How could he have given the signal? A. Why give it with his hand or holler. Q. How did the brakemen do it under such circumstances—when they are right next to the

engine? A. Why a man most generally hollers. Q. Are you familiar with any freight cars in use that have a coupling pin so that it cannot be drawn all the way out? A. Yes, sir. Q. In drawing a coupling pin and making a fly what would the brakeman have to do? A. Have to keep hold of the pin and holler. Q. Whether you have cars of that kind in your trains right along? A. Handle them. Q. Whether you have cars in your trains with coupling pins of that kind? A. Yes, sir."

Melvin Farnham, the conductor of the train on which the plaintiff was hurt, and who had been in railroad service since 1869, and was on the train at the time of the accident, was asked: " Q. In making a fly how does the brakeman signal the engineer, generally? A. In making a fly he generally hollers at him. Q. Whether that could have been done in this case? A. I think it could. Q. About what is the distance from the engineer back to where the brakeman would be standing on the front of the car ready to make a fly? A. Well, about twenty or twenty-five feet, probably. Q. In your judgment how could the brakeman have made that flying switch and signaled the engineer without going to the corner of the car. A. Why, he could have taken hold of those iron steps and reached out beyond the corner of the car. Q. How else could he have signaled besides that? A. He could have signaled him over the top of the tank. Q. And he could have called to him? A. Yes, sir." Looking at photographs of different kinds of freight cars given in evidence by the defendant he was asked: " Q. Whether from time to time in the train of which you were conductor, you were handling cars like those represented in the photographs before? A. Yes, sir, we have handled cars like those. Q. Whether you have handled cars of different styles from those shown in any other picture before you. A. Yes, sir."

Benjamin Ross, a brakeman on the train at the time of the accident and of six or seven years experience, was asked, " Q. Whether you were handling cars like that shown in the picture from time to time on the train on which you were a brakeman? A. Yes, sir. Q. Look at the model I show you and state whether you handled cars in that train from time to time constructed like that model? A. At that time? Q. Any time before and since? A. Yes, sir. Q. What have you to say about cars constructed like the model, with regard to having

handles on the side—how many and where located? A. I have seen them on the side, around the corner and have seen them on the end. Q. Sometimes one place and sometimes another? A. Sometimes one place and sometimes another. Q. How about there being one handle? A. I have seen that handle on one corner and not on the other. Q. How many on the car then? A. Two on the car. Q. One at each side near the end? A. Each side near the end. Q. Look at those photographs and state what you have to say about handling cars on your train from time to time then and now like the cars represented by those pictures? A. I have handled I guess pretty nearly all that kind of cars. Q. Have you handled cars different from those? A. Yes, sir. . . . Q. How could he (Dooner) have done it without going to the corner? A. I have often kept hold of a ladder or handle and given a signal to go ahead. Q. What handle do you mean? A. Step, call it. Q. On a car like this that had the iron step? A. Well you could take hold of that step. Q. That is the way you do it. A. I do it that way and I do it lots of other ways, different times."

The witness Alles, being recalled, was asked, " Q. Whether you have seen cars in use on your trains like the model here? A. Yes, sir. Q. Whether you have seen cars similar to that model with a handle on one side only? A. Yes, sir. Q. And whether on cars that have ladders on the side near the corner, you have seen and handled cars without any handles on the end? A. Yes, sir."

William L. Dampman, yard master for the Lehigh Valley Railroad Company, with an experience of seventeen years, after stating that there was a great difference in cars in respect of the appliances for brakemen, was asked, " Q. Look at these photographs which have been offered in evidence by defendant's counsel, and state whether you are handling cars on the railroad like those represented in those pictures? A. Yes, I have handled all those kind of cars. Q. Have you handled cars different still from these shown by the photographs? A. Yes, sir. Q. Whether you have handled cars like this model I show you? A. Yes, sir."

David Beltz, who had been engaged in handling freight trains since 1869 on the Lehigh Valley Railroad, and was a conductor since 1875, was asked, " Q. Whether on the trains that you

have handled, you have handled cars like that represented by this model? A. Yes. Q. Have you any idea how many different styles of freight cars first and last you have handled in your trains? A. Different kinds? Oh, we handle all kinds of cars, good many different kinds. . . . Q. Will you describe briefly some of the differences in these freight cars? A. Well there is a good deal of difference in them. Some cars have a good deal better equipment than others in regards to hand-holds, steps and such like."

After describing Lehigh Valley and Pennsylvania cars, he was asked: " Q How about others? A. Others have a step on opposite corners, crosswise. Q. Two on a car? A. Yes, sir, only two. Q. How about the handles? A. Only two handles. Others have a ladder on one end and nothing on the other; that is no handles or ladder whatever. . . . Q. Just look at those photographs which defendants put in evidence, and say whether if the trains you have conducted and been brakeman on, you have handled from time to time cars like those represented by these photographs? A. Yes, sir, those are all familiar, very familiar—all those kinds."

Charles F. Stetler, a railroad hand for twenty years of which he served for fifteen as conductor of a freight train on the Central Railroad of New Jersey, was asked, " Q. Whether on your trains from time to time covering the years you have been conductor you have handled cars like those shown by the photographs? A. Yes, handled all of them. Q. Have you handled cars like that represented by the model? A. Yes, we get those almost daily."

A. J. Kleeman, a freight conductor on the Central Railroad of New Jersey with thirteen years experience, was asked, " Q. What kind of cars do you handle? A. Handle different kinds of cars, principally freight cars. Q. Whether you have handled many or few styles of freight cars? A. Handled a great many different styles. Q. Have you any idea how many? A. I could not say exactly how many different styles. Q. During the month? A. Might be fifty, might be a hundred different styles in a month. Q. Whether you have handled cars like those represented in the photographs which we have offered in evidence? A. Yes, sir. . . . Q. Well, in the position in which this plaintiff was and under the circumstances he

described how, ordinarily, would the signal be given to the engineer drawing that pin? A. A man could raise up and give a signal in this style (illustrating). Q. Standing where he was, do you mean? A. No, if he raised up properly. Q. How else could he give a signal standing there? A. By word of mouth. Q. How often is it done by word of mouth? A. As frequently as it is by the hand."

Theodore T. Turbey, a freight conductor on the Pennsylvania railroad of eight years' experience, was asked, " Q. Have you any idea about how many different styles of freight cars you handle in a month? A. In a month—twenty-five to fifty I should say. Q. Look at these pictures here that I show you and state whether on the train on which you were conductor, you from time to time handled cars like those shown in the photographs, and whether you have been doing it during your service on the railroad? A. I think I have handled all those. Q. Whether you have handled other cars besides those shown in the pictures—cars of various kinds? A. Yes, sir. Q. A brakeman in making a flying switch ordinarily would give what kind of a signal to the engineer? A. Well, with our people we use the word of mouth more than anything else. It can be done more quickly. Q. By using the word of mouth where could the witness have stood and done that on this car? A. Why in the position he was while pulling the pin."

H. J. Miller, a railroad hand for nearly six years, was asked, " Q. What kind of cars do you handle in that train? A. Handle freight cars and coal cars. Q. How often do you handle freight cars? A. Well, every day. We switch the freight down there. Q. State whether on your train you handle cars like those shown by the photographs of the defendant? A. Yes, sir, handle cars like those. Q. In making a flying switch how do brakemen usually signal the engineer? A. Well, sometimes they give him a signal with their hand, sometimes they holler to the engineer, ' all right, go ahead.' Q. How does the frequency with which it is done compare the one way with the other—how often do you do it with the word of mouth? A. Why, do it oftener than with the hand."

James Ward, a railroader of twenty years' experience, testified that he handled very many different styles of freight cars coming from different roads, and was asked, " Q. Whether while

you have been in the employ of the Delaware & Hudson you have from time to time for a number of years past—five or six years past—handled cars like those shown in the photographs which have been offered in evidence by the defendant? A. Yes, sir, handled all those kind of cars. Q. Handled cars like that represented by the model? A. Yes, sir. Q. In making a flying switch how is it usual to give the engineer the signal? A. If when the engine is coupled on the car and you are going to make a fly, the usual thing is to holler—when the engine is coupled on the car and you are going to make a flying switch you usually holler ' all right, go ahead.'—Q. You heard Mr. Dooner testify in this case? A. Yes, sir. Q. Whether in your judgment the signal could have been given in that way in his case? A. It could, yes, sir."

From the foregoing review of the testimony given on the trial, it is perfectly apparent that there is no one standard of appliances for the use of brakemen in common use. On the contrary there are so many different kinds of arrangements for that purpose, all being in common use, that as to any one of them, there being from fifty to one hundred in number, each kind was as much in common use as any other. Many freight cars have nothing on the end, either ladder, steps or hand-holds In these cases there would be a ladder or steps on one side with a hand-hold on the opposite side of the car near the corner. In other cases there would be a ladder on the end either in the middle or at one side, sometimes with a hand-hold near one side, sometimes with none, and in these cases the rungs of the ladder were used as hand-holds. In many instances there would be a hand-hold on one side and another on the other side of the end of the car, and no ladder or steps. In other cases a hand-hold just around the corner on the side of the car, and another either at or near the middle or on the opposite side on the end. In some cases there would be a long hand-hold across the center of the end of the car, and nothing else, and in others there would be one or two perpendicular hand-holds on the end and nothing else. As a rule where ladders were used there were no steps, and where steps were used there were no ladders. Ladders were used without steps, and steps were used without ladders, the one answering the same purpose as the other, and both serving the same use as hand-holds. Where ladders only

were used without hand-holds the rungs were used as hand-holds, where steps were used without hand-holds, the steps served the purpose of hand-holds. There is no contradiction of this testimony. It comes from witnesses on both sides and it must be assumed as true. The plaintiff himself, describing the appliances at the end of the car, was asked by his own counsel, " Q. Did this have a ladder—anything except these two iron steps? A. And a brake-wheel on the left hand." So that this car was one of the kind that had the brake-wheel and brake, and two iron steps so arranged as to be used as hand-holds, in other words the brake rod and wheel and two hand-holds. The plaintiff was also asked, " Q. Well, the iron steps take the place of a ladder, don't they? A. Yes, sir. . . . Q. These iron steps have holes in them? A. Yes, sir. . . . I had hold of the step when I pulled the pin."

So that upon the plaintiff's own testimony he actually did use the step as a hand-hold, and would have been in no better condition if it had been a hand-hold in name as well as in fact. When it was too late he looked for another hand-hold on the corner and did not find it and lost his balance and fell off. But, very clearly, he should have looked for that additional hand-hold, before he put himself in such an extremely hazardous position. Not having done so he assumed the risk of his act and must take the consequences himself. He was under no obligation to take the position he did. He incurred no risk or hazard by not doing so, and there was no necessity for the action he did take. He could have signaled the engineer in other and safe modes, and if he had not succeeded in doing so the only consequence would have been that another attempt to switch would be made. Practically the whole of the testimony was that if he had held on to the step he could have signaled the engineer and been perfectly safe.

There was in reality no testimony to the effect that cars with a ladder or with steps, but without hand-holds on the end, were not in use the same as other methods. The plaintiff said he had never seen any, but the other witnesses said they had. Of all the photographs given in evidence by the defendant only two had any hand-holds on the end and they had neither ladders nor steps. Where there were ladders or steps some were on the side of the car and some were on the end, but close to the

side, and those cars had no hand-holds on the end. And yet all of these, eighteen in number, were in common use, handled every day. The model that was given in evidence had twc iron steps arranged so as to be used as hand-holds and the brake wheel and chain and nothing more. They were on the end of the car and the steps were in the center, but there were no hand-holds. Yet the witnesses testified that they constantly handled such cars. One witness, Stetler, said, " Yes, we got those almost daily." In the absence of affirmative testimony that cars provided with steps on the ends but without hand-holds were not in ordinary use, there was nothing to leave to the jury bearing on the question of negligence of the defendant. But the testimony that cars of that kind were in common use was simply overwhelming, and therefore we think the seventh point of the defendant requesting a binding instruction to find for the defendant should have been affirmed. We think the defendant's third point should have been affirmed with a qualification. The plaintiff was gradually approaching the face of the freight car while he was on the tender, and he certainly had as good an opportunity to notice the presence or absence of hand-holds as he had to observe the presence of the brake and the steps. If he failed to observe the absence of hand-holds it was his own fault and he could not hold the defendant liable for the consequences of such failure. With such a qualification the point should have been affirmed.

The rule of law in Pennsylvania in regard to the use of a particular appliance where other appliances are also used for the same purpose, as affecting the question of the liability of the employer for injuries occurring to the employee, is perfectly well settled by numerous decisions. If the particular appliance is one of several different kinds of appliances all in common use, the employer is not liable. One of our most recent utterances on this subject, and which we regard as directly applicable to this case, is contained in the opinion delivered by our brother MITCHELL in Kehler v. Schwenck, 144 Pa. 348. The plaintiff received his injuries while engaged in unhitching a dump car. The evidence showed that there were several methods of hitching in common use. The plaintiff complained that the method in use at the defendant's colliery was more dangerous than other methods in use and alleged negligence

in that respect.  We said, " The employer is bound to furnish machinery and appliances that are of ordinary character and reasonable safety, and the former is the conclusive test of the latter. . . . In the present case it was in undisputed evidence that there were three kinds of hitches to the dumper in common use, each having its own peculiar advantages adapted to different conditions of the dirt bank.  Much evidence was given as to whether it would not have been practicable and better, under the conditions of this colliery, to use the side hitch, or the box center hitch.  This question, though made the burden of the contest, was entirely irrelevant.  It was exclusively for the determination of the defendants themselves.  Where as in the present case, the evidence shows clearly that several methods are in general use, the choice being a matter of judgment, depending on the surrounding conditions, the owner has the absolute discretion to select according to his own judgment. The necessary control of his own business demands that this right shall be strictly maintained. . . . As already said there was a large amount of evidence as to the superiority of the side or upper hitch, the admission and discussion of which tended naturally to lead the jury to suppose that they might find a verdict on their own judgment which was the best; and this was put explicitly before them by the charge that, ' the proper question for you to determine is as to which of these hitches was the proper hitch for the parties to make use of at this colliery.'  This was giving the jury an entirely erroneous view of the point of the case and of their province in regard to it. They should have been told that if they found from the evidence that the lower hitch was the one in general use upon dirt-banks with an up grade, there was no negligence in the use of that hitch by the defendants."

In Ship Building Works v. Nuttall, 119 Pa. 149, the plaintiff was injured by a stick thrown from a circular saw, and claimed that by using a spreader the injury would have been prevented.  The case was allowed to go to the jury on this question and we reversed it for that reason.  Our brother WIL-LIAMS said, " As to the failure to provide a spreader the case of the plaintiff is, if possible, more clearly without merit.  The testimony shows that such an attachment is not in general use, and that there is no general agreement among mill owners or

practical sawyers that it is a desirable or useful attachment. It is not enough that some persons regard it as a valuable safeguard. The test is general use. Tried by this test, the saw of the defendant is such an one as the defendant had a right to use, because it is such as is commonly used by the mill-owners; and it was error to leave to the jury any question of negligence based on the failure to provide a spreader."

In Titus v. Bradford, etc., R. R. Co., 136 Pa. 618, the negligence complained of was the placing of a broad gauge car upon a narrow-gauge truck, and the use of an unsafe appliance in transporting it. We said, "But even if the practice had been shown to be dangerous that would not show it to be negligent. Some employments are essentially hazardous, as said in Northern Central Ry. Co. v. Husson, 101 Pa. 1, of coupling railway cars; and it by no means follows that an employer is liable, ' because a particular accident might have been prevented by some special device or precaution not in common use.' All the cases agree that the master is not bound to use the newest and best appliances. He performs his duty when he furnishes those of ordinary character and reasonable safety, and the former is the test of the latter; for in regard to the style of the implement, or nature of the mode of performance of any work, ' reasonably safe,' means safe according to the usages, habits and ordinary risks of the business. Absolute safety is unattainable, and employers are not insurers. They are liable for the consequences not of danger but of negligence; and the unbending test of negligence in methods, machinery and appliances is the ordinary usage of the business. No man is held by law to a higher degree of skill than the fair average of his professional trade, and the standard of due care is the conduct of the average prudent man. The test of negligence in employers is the same, and however strongly they may be convinced that there is a better or less dangerous way, no jury can be permitted to say that the usual and ordinary way, commonly adopted by those in the same business, is a negligent way for which liability shall be imposed." In Allison Mfg. Co. v. McCormick, 118 Pa. 519, we said, " The general rule requires of the master that he provide materials and implements for the use of his servant such as are ordinarily used by persons in the same business; but he is not required to secure the best known materials, or to

subject such as he does provide to a chemical analysis in order to settle by experiment what remote and possible hazard may be incurred by their use."

In Lehigh Coal Co. v. Hayes, 128 Pa. 294, we said, "The rule in regard to the obligation of the employer respecting the character of the tools and appliances furnished by him has been repeatedly stated in the recent decisions of this court. Thus in Pittsburg &c. R. Co. v. Sentmeyer, 92 Pa. 276, we said that when the employer furnishes his employees, 'with tools and appliances which though not the best possible, may, by ordinary care be used without danger, he has discharged his duty and is not responsible for accidents.'" In Payne v. Reese, 100 Pa. 301, we said, "An employer is not bound to furnish for his workmen the 'safest' machinery, nor to provide the 'best methods' for its operation in order to save himself from responsibility for accidents resulting from its use. If the machinery be of an ordinary character and such as can with reasonable care be used without danger to the employee it is all that can be required from the employer; this is the limit of his responsibility and the sum total of his duty.'" In Reese v. Hershey, 163 Pa. 253, we said, "The average untrained mind is apt to take the fact of injury as sufficient evidence of negligence. Moreover the use of a dangerous machine is very commonly considered ground for holding the employer responsible, whereas the test of liability is not danger but negligence, and negligence can never be imputed from the employment of methods or machinery in general use in the business."

In Sykes v. Packer, 99 Pa. 465, Mr. Justice MERCUR, delivering the opinion, said, "An employer does not impliedly guarantee the absolute safety of his employee. In accepting an employment the latter is assumed to have notice of all patent risks incident thereto of which he is informed, or of which it is his duty to inform himself : Whart. on Negl. sec. 206. When, therefore, he undertakes hazardous duties, he assumes such risks as are incident to their discharge from causes open and obvious, the dangerous character of which causes he has had opportunity to ascertain."

Without continuing these citations of which there are many more that might be quoted, it is our duty to say that upon all the considerations above indicated we think the plaintiff's case is without legal merit. It is true he was grievously hurt and

all the instincts of humanity prompt the expression of a profound sympathy with him in his misfortune. But disputed contentions involving well settled legal principles cannot be determined upon feelings of sympathy or pity. In all fairness to the plaintiff it is evident that his injury was due far more to his own want of thoughtfulness and care than to any insufficiency of appliances. It was the extreme of rashness for him to venture to the side of the car standing on a beam only four inches wide and without any support of which he could lay hold. There was not the slightest occasion for his taking such a terrible risk. It is true he succeeded in reaching the side of the car and giving the signal, and doubtless he was thereby emboldened to repeat the hazard in his attempted return. But the risk was all his own ; he assumed it voluntarily and unnecessarily, and employees who do such things are barred from recovery for the results of their indiscretion by the plainest and most firmly established rules of law which cannot possibly be surrendered. If the plaintiff had simply held on to the iron step while he gave, or attempted to give, the signal to the engineer he would have been perfectly safe. Or if he had taken hold of the upper step standing on the lower one he could easily have seen the engineer and signaled him.

But even if he could do neither of these things and give the signal, he was nevertheless without legal excuse for assuming the very great risk which caused him the loss of his foot. In the Sentmeyer case above cited, the person injured was a flagman who, without necessity for his so doing, got upon the top of a box car and while riding there he was struck and killed by the timbers of a bridge under which the train passed. We held that it mattered not whether the bridge was lower than it should have been, the flagman had no right to expose himself to such a risk. He could have ridden on the engine or in the caboose but he chose to ride on the top of the car, and for that reason there could be no recovery. GORDON, J., in delivering the opinion said, " When men are hired, something must be predicated of their judgment and prudence, and, hence, when the employer furnishes them with tools and appliances which, though not the best possible, may by ordinary care be used without danger, he has discharged his duty and is not responsible for accidents. But again: the defendant was liable for the consequences of such dangers as it subjected the employee

to, and not for those to which he subjected himself." Our books of reports abound with cases in which we have uniformly refused to permit a recovery in damages where the party's own carelessness in assuming unnecessary risks was the occasion of his injury. It is not necessary to cite them. The underlying principle of all of them is the same and is without dispute.

So too upon the other question, the common usage of this class of appliances. The doctrine is undisputed and it matters not in a given case whether the appliance was the best and the safest. It is enough to know that it was in common use. It was so fully proved on the trial, that appliances of the same character as were upon the car in question, were in common use, that it cannot be said to be a disputed question. That there were upon the end of the car two hand-holds, a brake and a wheel was proved by the plaintiff himself. That there was no uniformity in the position of hand-holds in common use on the ends of cars was the undisputed testimony on both sides. That there were numerous varieties of the appliances in general use, and that in the great majority of them there were not more than two hand-holds, and in many only one and in some none at all was also undisputed. The only contention of the plaintiff as to negligence was that there should have been another hand-hold somewhere on the end of the car, but there was no proof of any general use requiring such an additional hand-hold, and in the absence of such proof the basis of the charge of negligence disappears. Finally it is manifest that the plaintiff's injury was not due to a want of hand-holds but to his own inexcusable want of care in the use of those that were provided.

It is almost needless to add that the question upon which the case is now decided was not considered or decided at the former hearing in this court. Much more testimony was given at the second trial than at the first, and the question of common use was far more widely developed than on the first trial. The testimony given on the second trial was of such a character as to challenge a critical investigation in order to determine whether it conformed to the standard required by all our decisions, without at all invading the province of the jury.

Judgment reversed.

MITCHELL, J., dissents.